# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: March 25, 2024

```
* * * * * * * * * * * * * *  *
JEAN GOLDEN,                 *   No. 18-1223V
                             *
        Petitioner,          *   Special Master Sanders
                             *
v.                           *
                             *
SECRETARY OF HEALTH          *
AND HUMAN SERVICES,          *
                             *
        Respondent.          *
* * * * * * * * * * * * * *  *
```

*Bridget C. McCullough*, Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Ryan D. Pyles*, United States Department of Justice, Washington, DC, for Respondent.

### FACT RULING[1]

On August 15, 2018, Jean Golden ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program ("the Program").[2] Petitioner alleged that she suffered from chronic inflammatory demyelinating polyneuropathy ("CIDP")[3] as a result of an influenza ("flu") vaccine administered on November 12, 2015. Pet. at 1, ECF No. 1. Following the submission of

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] CIDP is "a slowly progressive, autoimmune type of demyelinating polyneuropathy characterized by progressive weakness and impaired sensory function in the limbs and enlargement of the peripheral nerves, usually with elevated protein in the cerebrospinal fluid." *Dorland's Illustrated Medical Dictionary* 1468 (33rd ed. 2020) [hereinafter "*Dorland's*"]. Neuropathy refers to "a functional disturbance of pathologic change in the peripheral nervous system[.]" *Id.* at 1250. Polyneuropathy, also known as peripheral neuropathy, is "neuropathy of several peripheral nerves simultaneously[.]" *Id.* at 1468. Demyelination is "destruction, removal, or loss of the myelin sheath of a nerve or nerves." *Id.* at 480. A myelin sheath is "the cylindrical covering on the axons of some neurons[.]" *Id.* at 1673. Axon is "the process of a neuron by which impulses travel away from the cell body[.]" *Id.* at 183.

expert reports and briefing, the parties still disagree on a number of issues, including whether Petitioner's neuropathy symptoms began before her November 12, 2015 vaccination. After carefully analyzing and weighing all the evidence and testimony presented in this case in accordance with the applicable legal standards,[4] I find that the record contains preponderant evidence that Petitioner's neuropathy predated her vaccination.

## I.  Procedural History

Petitioner filed medical records and an affidavit, along with her petition, on August 15, 2018. Pet.; Pet'r's Exs. 1–13, ECF No. 1. She then filed a statement of completion on August 17, 2018. ECF No. 7. Petitioner filed additional medical records between April 17, 2019, and October 2, 2019, as well as a statement of completion on October 2, 2019. Pet'r's Ex. 14, ECF No. 15-1; Pet'r's Ex. 15, ECF No. 20-1; Pet'r's Exs. 16–18, ECF No. 23; Pet'r's Exs. 19–22, ECF No. 26; Pet'r's Exs. 23–26, ECF No. 28; ECF No. 29.

On January 23, 2020, Respondent filed his Rule 4(c) report arguing that this case is not appropriate for compensation. Resp't's Report, ECF No. 31. He asserted that "the medical records demonstrate that [P]etitioner's symptomology more likely than not predated vaccination." *Id.* at 14. Respondent further claimed that "the medical records themselves reflect inconsistencies in [P]etitioner's recollections." *Id.*

On April 24, 2020, Petitioner filed an expert report by Frederick Nahm, M.D., Ph.D., Dr. Nahm's curriculum vitae ("CV"), and medical literature. Pet'r's Exs. 27–41, ECF No. 32. Respondent filed an expert report from Vinay Chaudhry, M.D., Dr. Chaudhry's CV, and medical literature on July 27, 2020. Resp't's Exs. A, A Tabs 1–13, B, ECF Nos. 34–35. Petitioner filed a supplemental expert report from Dr. Nahm on April 27, 2021. Pet'r's Ex. 42, ECF No. 42-1.

On June 2, 2021, Respondent indicated via email that he does not believe an entitlement hearing is necessary in this case, but Petitioner responded that she would prefer to proceed with an entitlement hearing. Informal Comm., docketed July 14, 2021. Respondent noted that he would need to retain a new expert if this case were to proceed to a hearing because Dr. Chaudhry is no longer able to testify. *Id.* Respondent suggested briefing to determine whether a hearing is necessary. *Id.* I held a status conference to discuss this issue on September 7, 2021. Min. Entry, docketed Sept. 7, 2021. Respondent noted concerns about the onset of Petitioner's symptoms and her diagnosis. Scheduling Order at 1, ECF No. 43. I noted "concerns regarding Petitioner's pre-vaccination medical records as well as those from shortly after her vaccination." *Id.* I directed the parties to submit briefing regarding the issues in dispute in the form of prehearing submissions to help me determine whether an entitlement hearing is necessary. *Id.*

---

[4] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

Petitioner filed her brief on December 25, 2021. Pet'r's Br., ECF No. 45. Respondent filed a response on March 8, 2022. Resp't's Resp., ECF No. 48. On July 7, 2022, I ordered Petitioner to file a reply addressing her medical theory. Scheduling Order at 1, ECF No. 49. Petitioner filed her reply on September 28, 2022. Pet'r's Reply, ECF No. 52.

On November 29, 2022, I held a status conference with the parties to discuss their briefing. *See* Min. Entry, docketed Nov. 29, 2022. Petitioner noted that she would like to retain an immunologist to build on her medical theory, but Respondent noted continuing concern about the factual issues in this case. I determined that I would issue a Fact Ruling to resolve these issues, specifically the onset of Petitioner's symptoms.

This matter is now ripe for consideration.

## II. Factual Background

### A. Medical Records

#### 1. Pre-vaccination Medical Records

On February 14, 2012, Petitioner presented to her primary care provider ("PCP"), Stephen Grybowski, M.D. Pet'r's Ex. 26 at 136, ECF No. 28-4. She reported "intermittent paresthesias[5] in her feet" following thyroid[6] surgery/thoracic goiter[7] removal. *Id.* Petitioner noted that the paresthesias would "come and go and ha[d] no specific exacerbating factors." *Id.* During a neurological exam Dr. Grybowski performed the same day, Petitioner "indicated that the numbness in her feet re occurred while she was sitting on the edge of the examining table." *Id.* at 137. Dr. Gybowski noted that Petitioner had a history of malignant melanoma[8] and had had an "excision approximately [five] years ago[.]" *Id.* at 136.

On November 21, 2012, Petitioner followed up with Dr. Grybowski and complained of upper respiratory congestion and a sore throat. Pet'r's Ex. 3 at 2, ECF No. 1-6. She stated that she "fel[t] that she ha[d] hypothyroid[9] symptoms with fatigue, depression, weight gain, thinning hair[,] etc." *Id.* She reported that she had not "felt good since September[,]" and she was concerned about lesions on her arm, neck, and back. *Id.* Dr. Grybowski's assessment included acute sinusitis and pharyngitis as well as neoplasm of uncertain behavior of skin, and "[o]ther malaise and fatigue[.]" *Id.* at 4.

---

[5] A paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's* at 1362.
[6] The thyroid gland is "an endocrine gland normally situated in the lower part of the front of the neck[.]" *Dorland's* at 773.
[7] Goiter is "an enlargement of the thyroid gland, causing swelling in the front part of the neck." *Dorland's* at 787.
[8] Malignant melanoma is "a malignant neoplasm of melanocytes[] . . . occurring most often in the skin . . . ." *Dorland's* at 1109.
[9] Hypothyroidism is "deficiency of thyroid activity, characterized by decrease in basal metabolic rate, fatigue, and lethargy[.]" *Dorland's* at 895.

On August 8, 2013, Petitioner returned to Dr. Grybowski reporting dizzy spells for the past three months, low back pain, and rectal bleeding. *Id.* at 5. Dr. Grybowski's assessment was dizziness and giddiness and hypercholesterolemia. *Id.* at 6. When Petitioner returned to Dr. Grybowski on August 20, 2013, she reported no dizziness since her last appointment. *Id.* at 8. She followed up with Dr. Grybowski on November 21, 2013, and reported "[r]are dizziness[]" as well as recent bronchitis, urinary tract infection ("UTI"), and a rash. *Id.* at 11. Petitioner also reported year-round but minor post-nasal drip and lower back pain "on and off." *Id.* Petitioner indicated that she "[f]el[t] tired[,]" and Dr. Grybowski noted that they had "assessed [Petitioner's fatigue] before; had normal labs a few months ago[]." *Id.*

On February 13, 2014, Petitioner presented to an allergist, who assessed her with allergic rhinitis and asthma. Pet'r's Ex. 20 at 9, 11, ECF No. 26-2. On September 15, 2014, Petitioner presented to an orthopedic surgeon and reported right knee pain since May of 2014 and "a couple of episodes where the knee felt like it would give out." Pet'r's Ex. 21 at 2, ECF No. 26-3. The surgeon noted that a June 2014 x-ray showed valgus osteoarthritis,[10] and his impression was "[v]algus osteoarthritis with a high probability for a meniscal[11] tear." *Id.* On September 22, 2014, she reported "right knee pain since May and instability occasionally." *Id.* at 3.

On October 12, 2015, Petitioner presented to John Jepma, D.O., who works in Dr. Grybowski's office, and reported UTI symptoms and mild back pain. Pet'r's Ex. 3 at 31. Under "past medical history[,]" Dr. Jepma listed "[large] goiter left side[, m]alignant melanoma in situ[, a]sthma[, and e]nvironmental allergies[.]" *Id.*

### 2. Vaccination and Post-vaccination Medical Records

Petitioner received the flu vaccine at issue at a pharmacy on November 12, 2015, when she was seventy-three years old. Pet'r's Ex. 1 at 2–3, ECF No. 1-4. Twelve days post vaccination, on November 24, 2015, Petitioner went to the emergency room ("ER") by ambulance. Pet'r's Ex. 2 at 168, ECF No. 1-5. She complained of "dizziness and shakiness that has been an ongoing issue[]" but that it did not "seem to be going away." *Id.* Petitioner also reported a "tingling sensation of lower extremities[,]" nausea, and back pain. *Id.* She stated that she thought she had a bladder infection that was not "getting better." *Id.* Petitioner was evaluated by attending physician Sarah Delaney-Rowland, M.D. *Id.* at 166–67, 170. Dr. Delaney-Rowland filled in an "emergency physician record" form by hand and initialed the form at the bottom.[12] *Id.* Indicating Petitioner's "chief complaint[,]" Dr. Delaney-Rowland circled "dizziness[,]" and she wrote that Petitioner reported feeling like she was going to pass out earlier that day, between 3:00 and 4:00. *See id.* at 166. Dr. Delaney-Rowland wrote that the dizziness lasted for a "few hours[,]" and she circled "sudden" onset and both "better" and "gone now[.]" *Id.* Dr. Delaney-Rowland also wrote that

---

[10] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *Dorland's* at 1326.

[11] Meniscus refers to "one of the menisci of the knee joint[.]" *Dorland's* at 1119.

[12] The form shows a hand-written signature that appears to say "SR" in a section of the form designated for an M.D.'s signature. *See* Pet'r's Ex. 3 at 167. Because Dr. Delaney-Rowland is noted as the sole ER physician who evaluated Petitioner in a typed timeline of Petitioner's ER course, it is clear that Dr. Delaney-Rowland is the author of the form. *See id.* at 170.

4

Petitioner complained of lightheadedness, nausea, gas, chest pain, and "heart racing this am[.]" *Id.* The doctor noted that Petitioner reported experiencing vertigo[13] a "few y[ears] ago." *Id.* Reviewing a list of "associated symptoms[,]" Dr. Delaney-Rowland crossed out hearing loss, ear pain, nausea/vomiting, sense of movement, headache, weakness, sense of confusion, decreased ability to stand/walk. *See id.* She circled "lightheadedness[.]" *Id.* Next to "numbness[,]" Dr. Delaney-Rowland wrote "chronic[,]" and she drew an arrow to a part of the form that had more room to write, where she wrote "paresthesias @ [lower extremities] x months[.]" *Id.* Next to a prompt stating "[s]imilar symptoms previously[,]" Dr. Delaney-Rowland wrote "x months[.]" *Id.* Next to "[r]ecently seen/treated by doctor/hospitalized[,]" the doctor wrote that Petitioner said "not for a while[.]" *Id.* Dr. Delaney-Rowland also wrote "Dr. Jepma October[.]" *Id.*

In the review of systems section, Dr. Delaney-Rowland wrote that Petitioner complained of thirst and noted "intentional w[eight] loss[.]" *Id.* The doctor made notes regarding Petitioner's digestion history and wrote that Petitioner complained of "low back pain x few months." *Id.* In the past history section of the form, Dr. Delaney-Rowland circled "asthma[,]" and she wrote in that Petitioner had a history of melanoma. *Id.* Regarding past surgeries and procedures, Dr. Delaney-Roland wrote a word that is difficult to decipher and "thyroid[.]" *See id.*

Dr. Delaney-Rowland did not note any abnormalities on Petitioner's physical exam, and she wrote that Petitioner was "well appearing[.]" *Id.* at 167. She reviewed Petitioner's bloodwork, and noted some results, such as platelet and thyroid stimulating hormone levels, and she reviewed Petitioner's EKG. *Id.* Regarding Petitioner's diagnosis, Dr. Delaney-Rowland wrote, "multiple vague complaints all of which have been going on for a period of time x months." *Id.* In the "clinical impression" section of the document, Dr. Delaney-Rowland circled "[d]izziness[.]" *Id.* She also wrote in assessments of mild thrombocytopenia[14] and transient lightheadedness of unclear etiology. *Id.*

Petitioner was discharged to her home that evening, and the impression at discharge was "[d]izziness and giddiness." *Id.* at 175. The discharge note stated that the "[p]roblem is an ongoing problem[]" and indicated that Petitioner's symptoms improved while she was at the hospital. *Id.* She was instructed to follow up with Dr. Grybowski in two to three days. *Id.*

On December 1, 2015, Petitioner followed up with Dr. Grybowski after her ER visit. Pet'r's Ex. 3 at 34. She noted that she presented to the ER for dizziness and feeling "like she was going to pass out." *Id.* Petitioner reported that she had "one episode briefly since [when she] was at a restaurant." *Id.* She indicated that she had intentionally lost weight through diet. *Id.* Petitioner complained that her "[f]eet and legs feel numb and prickly[.]" *Id.* She reported that her legs and feet become prickly and uncomfortable daily, and she also complained of some backache and knee discomfort. *Id.* Dr. Grybowski noted that Petitioner had been treated for a UTI and that she "[h]ad some palpitations with dizziness but as an effect[,] not cause. Has chest soreness on and off . . . ." *Id.* Lab tests revealed high vitamin B12 levels. *Id.* at 36. Dr. Grybowksi's assessment included neuropathy, dizziness, low back pain, degenerative arthritis of knees, and asthma. *Id.*

---

[13] Vertigo is "an illusory sense that either the environment or one's own body is revolving[.]" *Dorland's* at 2021.

[14] Thrombocytopenia is a "decreased in the number of platelets, such as in thrombocytopenic purpura." *Dorland's* at 1892.

Petitioner returned to Dr. Grybowski on March 10, 2016. *Id.* at 38. She reported numbness in both legs and constant heaviness in her feet. *Id.* She noted back pain and that she was "[n]ot vertiginous but feels like she might pass out, particularly if she has been standing in one spot." *Id.* She stated that she did not feel comfortable driving due to leg numbness and that she was continuing to lose weight on her weight loss program. *Id.* On April 22, 2016, Petitioner presented to a general surgeon, William Schu, M.D., involved in her previous surgery and asked whether her symptoms were related to her thyroid. Pet'r's Ex. 4 at 104, ECF No. 1-7. She reported "progressive lower extremity weakness which is now interfering with her ability to walk and drive." *Id.* She complained of weakness, numbness, and dizziness. *Id.* Dr. Schu denied that her symptoms were due to her thyroid. *Id.* at 105.

Petitioner presented to Mohsin Ali, M.D., a neurologist, on April 26, 2016, for a consultation. Pet'r's Ex. 5 at 2, ECF No. 1-8. Petitioner reported "numbness in her feet, which started [six to twelve] months ago." *Id.* She noted that "[a] year ago, she developed right knee problems and saw orthopedics and was told that she had no cartilage in her right knee joint[,] and she may need right knee replacement." *Id.* Petitioner recounted that she then lost forty pounds through diet and exercise in the hope that it would help her knees. *Id.* She continued that "[s]ix months ago when this was happening, she developed tingling, numbness in her feet, which now has at least [sic] up to her knee joints bilaterally." *Id.* Petitioner reported bilateral knee pain due to arthritis, but she denied foot pain. *Id.* She also complained of tenderness when touching the skin below her knee joints, mild back pain, and neck stiffness. *Id.* She reported a history of vertigo in 2011, but she indicated that it had improved. *Id.* On exam, Petitioner had "decreased cold pinprick vibration sensation in her feet[,]" unsteady gait, and difficulty with tandem walking. *Id.* at 3. She also "sway[ed] side to side while doing Romberg testing[15] without falling down." *Id.* Her "[d]eep tendon reflexes [were] 2+ in arms, 1+ in knees[,] and 1+ at ankles." *Id.* Dr. Ali suspected peripheral neuropathy and noted concern for cervical and lumbosacral spinal stenosis.[16] *Id.*

A May 2, 2016 lower extremity EMG/NCS showed evidence of "sensory and motor, peripheral neuropathy with demyelinating and axonal[17] features." Pet'r's Ex. 25 at 6–7, ECF No. 28-3. On May 6, 2016, a lumbar spine MRI revealed "[d]iffuse disc bulges at the L1-2 through L5-S1 levels with minimal thecal sac[18] compression." Pet'r's Ex. 2 at 142–43. A cervical spine MRI revealed "cervical spondylosis[19] at the C4-5 through C7-T1 levels without spinal cord

---

[15] Romberg sign is "swaying of the body or falling when standing with the feet close together and the eyes closed[.]" *Dorland's* at 1686.

[16] Stenosis is "an abnormal narrowing of a duct or canal[.]" *Dorland's* at 1740.

[17] Axonal neuropathy, or axonopathy, is "a disorder disrupting the normal functioning of the axons." *Dorland's* at 183.

[18] The thecal sac, also known as the dural sac, is "the portion of the spinal dura mater extending caudally from the level of the first or second lumbar vertebra to the attachment at the filum terminale externum, about the first or second sacral vertebra, and containing the lumbar cistern, cauda equina, cerebrospinal fluid, and filum terminale internum[]" or "the entire length of the spinal dura mater from the foramen magnum to the attachment at the filum terminale externum; located in the vertebral canal and containing the spinal cord, spinal roots, and the contents of the lumbar cistern." *Dorland's* at 1633.

[19] Spondylosis is "ankylosis of a vertebral joint[]" or "degenerative spinal changes due to osteoarthritis." *Dorland's* at 1725.

compression.[20]" *Id.* at 140. A May 9, 2016 upper extremity EMG/NCS showed "evidence of sensory and motor, peripheral neuropathy with demyelinating and axonal features." Pet'r's Ex. 25 at 3–5. Dr. Ali also noted that "[u]nderlying bilateral median nerve compression, such as seen in carpal tunnel syndrome[,][21] cannot be excluded in the presence due to generalized neuropathy [sic]." *Id.* at 5.

On June 24, 2016, Petitioner returned to Dr. Ali. *Id.* at 13. The subjective portion of this medical record is very similar to that from the April 26, 2016 record. *See* Pet'r's Ex. 5 at 2. Dr. Ali again noted that Petitioner presented "for evaluation of numbness in her feet[]" except he now wrote that it "started [six] months ago[]" rather than six to twelve months ago. *Id.*; Pet'r's Ex. 25 at 13. Dr. Ali again noted that Petitioner reported that she developed right knee problems one year prior and that she lost weight in an attempt to help her knees. *Id.* Dr. Ali added that Petitioner stated that she was "absolutely sure that she had [a f]lu shot in November 2015[,] and she developed [numbness] in December 2015." Pet'r's Ex. 25 at 13. He noted that Petitioner believed that her flu vaccination caused her neuropathy. *Id.* Dr. Ali then repeated Petitioner's report that "[s]ix months ago when this was happening, she developed tingling in her feet, which now has at least [sic] up to her knee joints bilaterally." *Id.* He also repeated Petitioner's description of her symptoms and her history of vertigo. *See id.* The physical exam findings were similar to those from Petitioner's April 26, 2016 exam. *See id.* at 14. Dr. Ali's assessment included "suspected CIDP." *Id.* at 14. He noted that "[e]pisode of [Guillain-Barré syndrome ("GBS")][22] is differential as only difference between GBS and CIDP is duration of clinical worsening." *Id.* The assessment also included peripheral neuropathy, cervical and lumbosacral spinal spondylosis, numbness of legs, imbalance and difficulty walking, and mild neck and back pain. *Id.*

On August 18, 2016, Petitioner presented to Michael Stanton, M.D., a neurologist, after being referred by Dr. Ali and Dr. Grybowski "for evaluation of progressive bilateral lower extremity numbness and gait instability that developed over the course of [one to two] months last winter and has subsequently slowly improved." Pet'r's Ex. 6 at 16, 20, ECF No. 1-9. Regarding the progression of her condition, Petitioner "describe[d] being healthy and unlimited in activities until the onset of symptoms in December 2015." *Id.* at 17. She recalled receiving a flu vaccine in mid-November of 2015 and that "[a]bout [four] weeks later in December, she started to develop tingling and numbness in both feet, as well as unsteadiness." *Id.* She continued that "her symptoms progressed such that by mid January she had numbness up to her knees, was unable to drive due to an inability to feel the pedals, and had to take stairs one step at a time due to imbalance." *Id.* Petitioner noted that her symptoms "[s]eemed to peak in the middle of January and had slowly improved since that time." *Id.* She recalled that "[a]bout the same time her sensory symptoms began, she also started to notice a sense of dizziness upon standing, which she describe[d] as

---

[20] Spinal compression is "a condition in which pressure is exerted on the spinal cord, as by a tumor, spinal fracture, etc." *Dorland's* at 393.
[21] Carpal tunnel syndrome is "an entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow. Symptoms result from compression of the median nerve in the carpal tunnel." *Dorland's* at 1794.
[22] GBS is "rapidly progressive ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection. An autoimmune mechanism following viral infection has been postulated. It begins with paresthesias of the feet, followed by flaccid paralysis of the entire lower limbs, ascending to the trunk, upper limbs, and face[.]" *Dorland's* at 1802.

feeling like she is going to faint." *Id.* Petitioner explained that this sensation would last for a few seconds and that she did not experience the symptom while sitting or lying down. *Id.* She also reported "a sense of nausea accompanied with the presyncope." *Id.* She acknowledged her history of low back pain but stated that this pain did not radiate to her legs. *Id.* Petitioner "denie[d] having any numbness or tingling or balance difficulties prior to December." *Id.* at 18. Dr. Stanton noted that following Petitioner's evaluation with Dr. Ali, "[t]here was some concern for a diagnosis of CIDP[.]" *Id.* at 17. Although Dr. Ali recommended prednisone[23] and intravenous immunoglobulin ("IVIG"),[24] Petitioner had declined these treatments. *Id.*

Dr. Stanton's impression was "[p]ossible GBS with recovery." *Id.* at 20. He noted that "[t]he temporal relationship to [Petitioner's] flu shot and monophasic presentation with a peak in symptom at [four to eight] weeks are suggestive of a mild acquired inflammatory demyelinating polyneuropathy (i.e. AIDP or GBS)." *Id.* However, following a physical examination and EMG, Dr. Stanton stated that "that [cannot] be confirmed." *Id.* Instead, he concluded that Petitioner's "EMG showed evidence for a very chronic, length dependent axonal peripheral neuropathy." *Id.* He recommended against treatment with steroids or IVIG. *Id.*

On August 25, 2016, Petitioner presented to Dr. Grybowski and reported numbness in her legs and constant heaviness and numbness, with occasional tingling, in her feet. Pet'r's Ex. 3 at 41. She also complained of dizziness "at least every other day[]" and back pain. *Id.* She followed up with Dr. Grybowski on September 26, 2016, and reported numbness and difficulty walking as well as leg pain when waking up. *Id.* at 45. She also noted back and knee pain. *Id.* On March 24, 2017, Petitioner continued reporting neuropathy symptoms, and she reported shortness of breath. *Id.* at 52. She "[s]till th[ought] her flu shot last year was the cause of" her neuropathy. *Id.*

On June 15, 2017, Petitioner presented to a pulmonologist for shortness of breath and other respiratory symptoms that had progressed for about eighteen months. Pet'r's Ex. 10 at 7, ECF No. 1-13. The pulmonologist suspected that these symptoms were due to her thyroid. *Id.* On July 3, 2017, Petitioner followed up with Dr. Schu, and his assessment was non-toxic multinodular goiter. Pet'r's Ex. 4 at 6, ECF No. 1-7. He referred her to a thoracic surgeon. *Id.* Petitioner presented to Christian Peyre, M.D., a thoracic surgeon on July 20, 2017. Pet'r's Ex. 10 at 14. Dr. Peyre noted that Petitioner reported that "her symptoms began after having a flu shot [two] years ago." *Id.* Petitioner indicated that "[t]wo weeks after the flu shot she was found to reportedly have CIDP after experiencing some neuropathy." *Id.* She continued that "[s]he wanted a second opinion, seen by neurology here and diagnosed it as AIDP." *Id.* Petitioner reported that "[d]uring this period of time she reports she initially started to notice some shortness of breath[,]" which "is mostly noticeable with exertion and is much less noticeable when she is at rest . . . ." *Id.* Dr. Peyre did not see an emergent need to remove her substernal thyroid, and he recommended yearly CT scans. *Id.* at 17.

On December 28, 2017, Petitioner returned to Dr. Ali. Pet'r's Ex. 25 at 19. Petitioner felt that she had CIDP rather than AIDP/GBS. *Id.* She reported worsening of her gait, falling a few

---

[23] Prednisone is a "synthetic glucocorticoid derived from cortisone, administered orally as an antiinflammatory and immunosuppressant in a wide variety of disorders." *Dorland's* at 1486.

[24] Immunoglobulin is "any of the structurally related glycoproteins that function as antibodies, divided into five classes . . . on the basis of structure and biological activity." *Dorland's* at 908.

times over the past year, intermittent facial numbness, wobbly legs, imbalance, and dizzy spells. *Id.* Although he noted that Dr. Stanton believed Petitioner more likely had AIDP/GBS, Dr. Ali noted that Petitioner felt her symptoms were worsening two years after their onset. *Id.* at 20. He repeated that "[t]he only difference between GBS and CIDP is duration of clinical worsening[.]" His assessment continued to include "[p]ossible CIDP" and peripheral neuropathy. *Id.*

On January 15, 2018, a lower extremity EMG/NCS showed evidence of a "sensory and motor demyelinating and axonal peripheral neuropathy[]" and "mild interval worsening[]" since her 2016 study. Pet'r's Ex. 5 at 7–8. An upper extremity EMG performed on January 22, 2018, showed "bilateral median nerve compression at" Petitioner's wrists and "bilateral ulnar nerve compression across [her] elbows." *Id.* at 9–11. Dr. Ali noted "electrophysiological evidence of sensory and motor peripheral neuropathy[]" that was "likely consistent with [Petitioner's] history of [GBS] in [the] past." *Id.* at 11.

On February 1, 2018, Petitioner returned to Dr. Ali and reported continuing problems with her gait, imbalance, dizziness, nausea, occasional facial numbness, and other issues. Pet'r's Ex. 25 at 22. Dr. Ali noted that Petitioner's foot numbness "started [two] years ago." *Id.* Dr. Ali's assessment included "[p]ossible CIDP[,]" peripheral neuropathy, bilateral carpal tunnel syndrome, and ulnar neuropathy.[25] *Id.* at 23.

Petitioner followed up with Dr. Stanton on June 27, 2019. Pet'r's Ex. 22 at 15, ECF No. 26-4. Dr. Stanton noted that Petitioner "[i]nitially [ ] reported progressive subacute onset from December 2015 through mid January 2016 approximately [four] weeks after her [flu] vaccination in November 2015. Her EMG here had suggested a more chronic axonal neuropathy." *Id.* Regarding his last assessment of Petitioner, Dr. Stanton wrote that Petitioner "had developed progressive numbness and tingling spreading from feet to knees, and poor balance over [six] weeks before stabilizing and then slowly improving." *Id.* He noted that based on her symptoms, he had thought "this might of [sic] been a sensory ataxic[26] perform a [sic] GBS[,]" but this could not "be confirmed since she had improved with intact reflexes and only mild sensory loss." *Id.* Petitioner reported that since her last appointment with Dr. Stanton, her numbness in her lower extremities "remained about the same[,]" but she reported "a greater loss of sensation in her feet[,]" occasional sharp pains, leg weakness when standing, and back pain. *Id.* at 16. She noted that she had recently completed a course of physical therapy and that she had not fallen in the last six months. *Id.* An EMG revealed "evidence of a moderately severe length-dependent sensorimotor axonal polyneuropathy[]" and "a progression from her study in August 2016." *Id.* at 18. Dr. Stanton noted that in 2016, he questioned whether Petitioner had GBS "given onset after flu vaccine[]" but that "[h]er initial EMG was consistent with a very chronic axonal neuropathy and not recovery from GBS[.]" *Id.* He wrote that her June 2019 EMG "[s]howed a worsening of her chronic axonal neuropathy consistent with exam and symptoms." *Id.* He noted that her EMG did not show demyelination suggestive of CIDP. *Id.* Dr. Stanton continued that "[t]he cause of [Petitioner's]

---

[25] Ulnar neuropathy is "any neuropathy of the ulnar nerve[.]" *Dorland's* at 1252.
[26] Ataxia is "failure of muscular coordination; irregularity of muscular action." *Dorland's* at 168.

idiopathic neuropathy is unclear[,] and some additional lab testing will be performed to evaluate for potential causes," including amyloid.[27] *Id.*

### B. Affidavit

On August 15, 2018, Petitioner filed a brief affidavit. Pet'r's Ex. 13, ECF No. 1-16. She stated that "[a]pproximately three [ ] weeks" following her November 12, 2015 flu vaccination, she "began to experience muscle weakness accompanied by numbness and tingling in [her] feet and legs." *Id.* ¶ 2–3. She noted that she was "ultimately diagnosed with" CIDP. *Id.* ¶ 4.

## III. Expert Reports[28]

### A. Petitioner's Expert, Frederick Nahm, M.D., Ph.D.

Dr. Nahm received his Master of Science and Ph.D. in neuroscience from the University of California, San Diego in 1990 and 1994, respectively. Pet'r's Ex. 41 at 1, ECF No. 32-16. He then earned his medical degree from the University of Michigan in 1996. *Id.* He completed a neurology residency through Harvard Medical School at Beth Israel Deaconess Medical Center in Boston, Massachusetts from 1997 to 2000, and he completed three fellowships in medical ethics, clinical neurophysiology, and neuromuscular medicine from 2000 to 2001. *Id.* at 1–2; Pet'r's Ex. 27 at 2, ECF No. 32-2. Following his fellowships, he "joined the Yale New Haven Health System at Greenwich Hospital, where [he] established one of the first Primary Stroke centers in the state." Pet'r's Ex. 27 at 2. He then joined the Yale Department of Neurology as a clinical assistant professor from 2006 to 2008 and has "served as Medical Director for a neurorobotics company building powered prosthetics for people with paralysis and other neuromuscular disabilities." *Id.*; Pet'r's Ex. 41 at 1. He founded a neurology practice in Greenwich, Connecticut in 2002, and he has more than seventeen years "of clinical experience in both acute neurological emergencies as well as outpatient and rehabilitation settings." Pet'r's Ex. 27 at 1; Pet'r's Ex. 41 at 1. He is board-certified by the American Board of Psychiatry and Neurology and the American Board of Electrodiagnostic Medicine, and he is licensed to practice in fourteen states. Pet'r's Ex. 27 at 2; Pet'r's Ex. 41 at 1.

Dr. Nahm wrote that before Petitioner's vaccination, she "had no neurological issues, and specifically no weakness, numbness[,] or difficulty walking." Pet'r's Ex. 27 at 13. He added that "[t]here was no report of any neurological disorders immediately prior to receiving the [flu] vaccination." *Id.* Discussing Petitioner's October 12, 2015 appointment with Dr. Jepma, Dr. Nahm noted that that the "[r]eview of systems was only positive for dysuria[29] and urinary frequency and urgency." *Id.* at 3. Dr. Nahm contended that at the time of Petitioner's November 12, 2015

---

[27] Amyloid is "the pathologic extracellular proteinaceous substance deposited in amyloidosis[.]" *Dorland's* at 68–69. Amyloidosis is "a group of conditions of diverse etiologies characterized by the accumulation of insoluble amyloid in various organs and tissues of the body, which comprises vital function. The associated disease states may be inflammatory, hereditary or neoplastic, and the deposition can be local or generalized (systemic)." *Id.* at 69.

[28] For the purposes of this Fact Ruling, I will limit my discussion of the expert reports to the experts' discussion of onset.

[29] Dysuria is painful urination. *Dorland's* at 579.

vaccination, "[h]istory of present illness at that time reported the petitioner to be in good health, exercising regularly, with no report of any numbness of the feet, and a review of systems entirely negative."[30] *Id.* However, Petitioner's vaccination record does not show a review of systems or a history of present illness, and it does not suggest that Petitioner was evaluated by a pharmacist or other medical professional. *See generally* Pet'r's Ex. 1. Instead, she filled out a seven-question standard questionnaire asking if she was currently sick and other questions about medical history and reactions to vaccines. *Id.* at 2. Petitioner checked "[n]o" in response to all of the questions. *Id.*

Dr. Nahm noted that Petitioner had a "[p]rior report of some foot paresthesia . . . in 2012[]" but that "no such symptoms were documented during medical follow-ups in 2012 and 2014." Pet'r's Ex. 27 at 13. He contended that Petitioner was not diagnosed with a peripheral nerve disorder prior to her vaccination and that "over the course of [four] years prior to the vaccination, there is only [one] mention of foot symptoms." *Id.* He asserted that "[t]he overwhelming evidence from review of the medical records is that between 2013 and 2016, no lower extremity peripheral nerve symptoms were present." *Id.* He concluded that "[t]he suggestion that the petitioner's symptomology predated the vaccination is thus incorrect and not supported by the medical record." *Id.* Discussing the findings of "chronic" damage on Petitioner's EMG studies, Dr. Nahm opined that this damage could have occurred after Petitioner's vaccination. *Id.* at 15. He wrote that the term "chronic" in an EMG "is not meant to imply the duration of clinical symptoms, but rather the nature of electrophysiological changes." *Id.* He continued that "[i]n the case of distal nerve injury, polyphasic reinnervated motor units can appear [six to eight] weeks after the initial insult, accounting for a 'chronic' appearance on EMG." *Id.*

In his supplemental expert report, Dr. Nahm did not dispute Respondent's expert's contention that Petitioner had a "number of symptoms[,] including tingling, paresthesia, numbness, leg pains, instability, low back pain[,] and dizzy spells spanning a time between [August 8, 2013,] and [November 24, 2015]." Pet'r's Ex. 42 at 1. However, Dr. Nahm contended that "[n]one of these prior symptoms listed ever occasioned the kind of eventful neurological condition [sic] and workup which only occurred post[ ]vaccination." *Id.* He wrote that Petitioner "had years of nonspecific symptoms, but never a clear diagnosis, and to suggest that these symptoms serve as evidence of a *condition* like that which occurred after vaccination is incorrect." *Id.* at 2. He wrote that Petitioner "had pain, at times numbness, dizziness over the span of [two] years, but there was never any wholly contained neurological event as she had after the vaccination that can explain her acute and chronic post-vaccination neuropathy." *Id.*

### B. Respondent's Expert, Vinay Chaudhry, M.D.

Dr. Chaudhry received his medical degree from All India Institute of Medicine in New Delhi, India in 1980. Resp't's Ex. B at 2, ECF No. 35-5. He completed neurology residencies at the University of Tennessee Center for Health Sciences in Memphis, Tennessee and the University of Alabama at Birmingham School of Medicine in Birmingham, Alabama between 1984 and 1987. *Id.* He then completed two fellowships in neuromuscular diseases at Johns Hopkins University School of Medicine in Baltimore, Maryland between 1987 and 1989. *Id.* at 3. He joined the Johns Hopkins University School of Medicine faculty as an instructor in 1989 and he has been a full

---

[30] Dr. Nahm did not cite Petitioner's vaccination record or any of her other medical records to support this statement.

professor since 2004. *Id.* He is also the Director of the EMG Laboratory at Johns Hopkins University and Johns Hopkins Hospital. Resp't's Ex. A at 1, ECF No. 34-1. He "specialize[s] in the field of neuromuscular diseases, which includes management of peripheral neuropathies." *Id.* Dr. Chaudhry is board-certified in neurology neuromuscular diseases, electrodiagnostic medicine, and clinical neurophysiology. *Id.* His clinical practice involves evaluation of "over 2000 patients a year mostly related to peripheral nerve disease." *Id.* He is an author of more than 120 publications and has served as a reviewer and editor for various journals. *Id.*

Dr. Chaudhry opined that Petitioner "suffered from chronic axonal sensorymotor polyneuropathy with symptoms present prior to the [flu] vaccination." *Id.* at 25. He stated that "[t]he onset of [Petitioner's] paresthesias preceded the [flu] vaccine as noted from her clinical records." *Id.* at 14. He cited Petitioner's November 24, 2015 ER record, which he stated showed that Petitioner had "several months of tingling and paresthesias in the legs." *Id.* Dr. Chaudhry also cited Petitioner's April 26, 2016[31] record from Dr. Ali, which stated that Petitioner's foot numbness started six to twelve months prior. *Id.* Dr. Chaudhry noted that six to twelve months before April of 2016 would place onset of Petitioner's numbness between April and October of 2015,[32] before the vaccination at issue. *Id.* He further cited Petitioner's intermittent paresthesias reported in February of 2012, her low back pain and dizzy spells in August of 2013, her leg pains in June and July of 2014, and her reported instability in September of 2014 as evidence that her condition predated the vaccination. *Id.*

## IV. Arguments of the Parties

In her brief, Petitioner discussed the multiple issues in this case, including Petitioner's diagnosis and medical theory. Regarding the onset of Petitioner's neuropathy, Petitioner stated that her "clinical symptoms of CIDP, lower extremity weakness and gait imbalance, started a little less than two [ ] weeks after the receipt of the [flu] vaccination." Pet'r's Br. at 16 (citing Pet'r's Ex. 27 at 16). She noted that before her November 12, 2015 flu vaccination, she "had never been diagnosed with a neurological disease or disorder[]" and had never visited a neurologist. *Id.* at 14. Petitioner argued that November 24, 2015, the date she presented to the ER, "should be used as the approximate onset date" for two reasons. First, "Petitioner's prior medical records are absent of any of her chief complaints in the [ER]." *Id.* at 15. Petitioner noted that she "had been seen by her [PCP][33] exactly one (1) month prior to her injury-causing influenza vaccination. She was seen for symptoms of a [UTI] and did not report or complain of tingling in her lower extremities[.]" *Id.* Second, Petitioner argued that "the records from the [ER] visit have internal inconsistencies in regard to the onset of Petitioner's symptoms and should be given little weight." *Id.*

Respondent argued that "[t]he record preponderantly establishes that [P]etitioner's alleged condition predated vaccination." Resp't's Br. at 17. He stated that "[o]nly twelve days following vaccination, on November 24, 2015, [P]etitioner reported a tingling sensation in her lower extremities that was clearly documented as having existed for months." *Id.* (citing Pet'r's Ex. 2 at 166–68). Respondent continued that "[n]ot until over seven months after vaccination, on June 24,

---

[31] Dr. Chaudhry incorrectly stated that this visit occurred on April 26, 2015. This appears to be an error, as he used the correct date when discussing Petitioner's medical records. *See* Resp't's Ex. A at 4.
[32] Dr. Chaudhry incorrectly stated that onset would have been between April and October of 2014.
[33] Petitioner was seen by Dr. Jepma, another provider in her PCP's office. Pet'r's Ex. 3 at 31.

12

2016, did [P]etitioner report during a neurology visit receiving her flu vaccination in November 2015 and developing neurological symptoms, specifically feet numbness in December 2015." *Id.* He noted that Petitioner's November 24 and December 1, 2015 medical records are inconsistent with her June 24, 2016 report that her neurological symptoms began in December of 2015. *Id.*

## V. Applicable Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as modified by 42 C.F.R. § 100.3; or (2) the petitioner suffered an "off-Table injury," one not listed on the Table, as a result of his receiving a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006).

Special masters, as finders of fact, "are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." *Moberly*, 592 F.3d at 1326. The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove her claim by a preponderance of the evidence. A special master must consider the record as a whole but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1).

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 933 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Id.* However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding

13

that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition.). While a special master must consider these opinions and records, they are not "binding on the special master or court." § 13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

## VI. Discussion

### A. Post-vaccination Medical Records and Petitioner's Statements

Twelve days post vaccination, on November 24, 2015, Petitioner presented to the ER, where she was evaluated by Dr. Delaney-Rowland, an attending physician. Dr. Delaney-Rowland's handwritten notes indicate specifically that Petitioner reported "chronic" numbness and lower extremity paresthesias for a period of months. Pet'r's Ex. 2 at 166. I find that this record provides persuasive evidence that Petitioner's neuropathy symptoms predated her vaccination.

Dr. Delaney-Rowland, as an attending ER physician, presumably fills in forms like the "emergency physician record" form in this case in the regular course of business. While portions of the form include prompts and symptoms to be checked off or circled, Dr. Delaney-Rowland handwrote in three separate places on the form, spanning both pages, that Petitioner complained of multiple symptoms for months. *See* Pet'r's Ex. 2 at 166–67. On the list of "associated symptoms," Dr. Delaney-Rowland added the note of "chronic" next to numbness, and she then specifically added, without a separate prompt from the form, that Petitioner had lower extremity paresthesias for months. *Id.* at 166. These details support that Dr. Delaney-Rowland was intentional and thoughtful in recording the duration and nature of Petitioner's symptoms.

Furthermore, Dr. Delaney-Rowland included numerous notes about Petitioner's medical history that are consistent with Petitioner's other medical records. Dr. Delaney-Rowland noted that Petitioner reported intentional weight loss and histories of melanoma, thyroid surgery, asthma, and vertigo "a few y[ears] ago." *Id.* Petitioner's pre-vaccination medical records repeatedly refer to her histories of melanoma, thyroid surgery, and asthma. *See* Pet'r's Ex. 26 at 126; Pet'r's Ex. 20 at 11; Pet'r's Ex. 3 at 31. Petitioner reported intentional weight loss to Dr. Grybowski approximately one week after the ER visit, on December 1, 2015. Pet'r's Ex. 3 at 34. She again reported intentional weight loss to Dr. Ali on June 24, 2016. Pet'r's Ex. 25 at 13. She also noted a history of vertigo during an appointment with Dr. Ali on April 26, 2016. Pet'r's Ex. 5 at 2. Dr. Delaney-Rowland also wrote that Petitioner had last been seen by a doctor in October, and she specifically noted that the doctor was "Dr. Jepma," Pet'r's Ex. 2 at 166. This is again consistent with Petitioner's other

medical records, which show that Petitioner presented to Dr. Jepma on October 12, 2015. Pet'r's Ex. 3 at 31. These are all specific details that Dr. Delaney-Rowland could presumably only know if she was paying careful attention to Petitioner's statements. That Petitioner reported symptoms for months would also be consistent with other portions of the ER record, which note that Petitioner reported "ongoing" symptoms. Pet'r's Ex. 2 at 168, 175. Petitioner argued in her prehearing brief that the records from the [ER] visit have internal inconsistencies in regard to the onset of Petitioner's symptoms[,]" Pet'r's Br. at 15, but it is unclear what these alleged inconsistencies regarding onset are.

The record from Dr. Delaney-Rowland contains one possible error. Although she wrote that Petitioner complained of lightheadedness and nausea by the "chief complaint[,]" she then crossed out "nausea/vomiting" on the "associated symptoms[] list. *See* Pet'r's Ex. 2 at 166. This could be an error, given that she crossed this out while also crossing out multiple other symptoms, or it could indicate that Petitioner did not report vomiting in conjunction with her nausea, which would be consistent with the remainder of the record. This could also indicate that Petitioner's nausea had resolved by the time of Dr. Delaney-Rowland's evaluation. I do not find that this possible error detracts from the overall credibility of this record, particularly the specific, handwritten portions of this record.

Furthermore, the notation that Petitioner had symptoms, specifically paresthesias, for months and "chronic" numbness is consistent with the April 26, 2016 medical record from Dr. Ali. Dr. Ali noted that Petitioner reported "numbness in her feet, which started [six to twelve] months ago." Pet'r's Ex. 5 at 2. Petitioner also indicated that "[s]ix months ago when this was happening, she developed tingling, numbness in her feet," which then progressed to her knees. *Id.* Six to twelve months before April 26, 2016, would place onset of these symptoms at sometime between April 26, 2015, and October 26, 2015. Notably, if Petitioner noticed numbness and paresthesias beginning in October of 2015 following her October 12, 2015 appointment with Dr. Jepma, this would account for why she did not report these symptoms until her next medical visit: the ER visit on November 24, 2015.

When Petitioner followed up with Dr. Grybowski on December 1, 2015, following her ER visit, he assessed her with neuropathy after she reported symptoms including dizziness and a "prickly" feeling and numbness in her lower extremities. Pet'r's Ex. 3 at 34, 36. Although the December 1, 2015 record does not address the onset of these symptoms, the symptoms are again consistent with Dr. Delaney-Rowland's notes from November 24, 2015. While Petitioner continued reporting similar symptoms during multiple medical appointments in the first half of 2016, the medical records do not indicate that she reported numbness beginning after her flu vaccination until her second appointment with Dr. Ali on June 24, 2016. *See* Pet'r's Ex. 25 at 13. This appointment was more than seven months following Petitioner's vaccination. This time lapse, despite multiple appointments discussing her symptoms with at least three different providers (Dr. Grybowski, Dr. Ali, and Dr. Schu) between December of 2015 and April of 2016, undermines the reliability of Petitioner's recollections more than seven months post vaccination.

Furthermore, Dr. Stanton, one of Petitioner's treating neurologists, implied that the onset and progression suggested by Petitioner was inconsistent with the electrodiagnostic evidence. He wrote on June 27, 2019, that Petitioner "[i]nitially [ ] reported progressive subacute onset from

15

December 2015 through mid January 2016 approximately [four] weeks after her [flu] vaccination in November 2015. Her EMG here had suggested a *more chronic* axonal neuropathy." Pet'r's Ex. 22 at 15 (emphasis added). Dr. Nahm contended that "chronic" EMG findings could be observed within months post vaccination, but he did not address Dr. Stanton's statement that the EMG findings in this case were "more chronic" than what Petitioner reported.

Although Petitioner consistently indicated that her neuropathy symptoms began after her November 12, 2015 vaccination from June 24, 2016, onwards, she was inconsistent in describing how long after her vaccination these symptoms started. In her prehearing brief, Petitioner argued that November 24, 2015, the date of her ER visit, "should be used as the approximate onset date[.]" Pet'r's Br. at 15. However, Dr. Delaney-Rowland's notes support that Petitioner's numbness and paresthesias predated this visit. On June 24, 2016, Petitioner reported onset of numbness in December of 2015. Pet'r's Ex. 25 at 13. She again reported a December 2015 onset to Dr. Stanton on August 18, 2016. Pet'r's Ex. 6 at 17. These reports are inconsistent with Petitioner's purported onset date, her ER visit record, and the record from her December 1, 2015 visit with Dr. Grybowski, which implied that her numbness began before December 1, 2015. *See* Pet'r's Ex. 3 at 34. On August 18, 2016, Petitioner told Dr. Stanton that her foot numbness and tingling began about four weeks after her mid-November 2015 flu vaccination, in December of 2015. Pet'r's Ex. 6 at 17. However, on July 20, 2017, Petitioner recounted to Dr. Peyre that "[t]wo weeks after the flu shot she was found to reportedly have CIDP after experiencing some neuropathy." Pet'r's Ex. 10 at 14. In her August 15, 2018 affidavit, Petitioner stated that her muscle weakness, numbness, and tingling in her feet and legs began "[a]pproximately three [ ] weeks" post vaccination. Pet'r's Ex. 13 ¶ 2–3. When viewed along with the remainder of the record, these inconsistencies further undermine the reliability of Petitioner's recollections. I find Petitioner's delayed and inconsistent recollections regarding onset less reliable than the contemporaneous medical records from the weeks following her November 12, 2015 vaccination.

### B. Pre-vaccination Symptoms

The medical records provide some evidence that Petitioner experienced neurological symptoms before her November 12, 2015 vaccination. For instance, she reported intermittent foot numbness and paresthesias on February 14, 2012. Pet'r's Ex. 26 at 136. She reported a three-month history of dizzy spells on August 8, 2013, and she again reported dizziness on November 20, 2013. Pet'r's Ex. 3 at 5, 11. Petitioner's providers did not appear to attribute these symptoms to one of her other medical conditions, and Petitioner later reported these symptoms in relation to her neuropathy.

Because Petitioner was not evaluated by a neurologist before 2016, it is difficult ascertain whether these symptoms, and other symptoms Petitioner reported in 2012, 2013, and 2014, were manifestations of her neuropathy. However, Respondent's expert, Dr. Chaudhry, cited the symptoms Petitioner reported from 2012 to 2014 as evidence that her neuropathy predated her November 12, 2015 vaccination. *See* Resp't's Ex. A at 14. Dr. Nahm did not persuasively rebut this. He conceded that Petitioner had "years of nonspecific symptoms[,]" including "pain, at times numbness, dizziness over the span of [two] years[.]" Pet'r's Ex. 42 at 1–2. He disagreed with Dr. Chaudhry because Petitioner "never [had] a clear diagnosis[]" prior to vaccination and because "there was never any wholly contained neurological event [like what] she had after the vaccination

16

that can explain her acute and chronic post-vaccination neuropathy." *Id.* However, a lack of a diagnosis does not mean a lack of a condition. Indeed, "[t]he fact that Petitioner's pre-vaccination symptoms were not understood to represent neuropathic issues is irrelevant. In the Program, onset of an alleged vaccine injury is *never* dependent on the date formal diagnosis occurs." *Mason v. Sec'y of Health & Hum. Servs.*, No. 17-1383V, 2022 WL 600415, at *24 (Fed. Cl. Spec. Mstr. Feb. 4, 2022). Furthermore, Dr. Nahm's contention does not persuasively account for the fact that a longstanding neuropathy can worsen over time. *E.g.*, *Haubner v. Sec'y of Health & Hum. Servs.*, No. 16-1426V, 2021 WL 5614942, at *34 (Fed. Cl. Spec. Mstr. Oct. 22, 2021) ("The medical records indicate that the main symptoms of [the petitioner's] neuropathy, including extremity pain, numbness, and tingling, appeared prior to vaccination, albeit in less severe forms.").

I find that Petitioner's pre-vaccination symptoms add further support to her post-vaccination medical records indicating that her neuropathy symptoms predated her vaccination. These records, coupled with the other evidence in the record, provide preponderant evidence that Petitioner's neuropathy predated her vaccination.

## VII.   Conclusion

After careful review of the record, I find that the record contains preponderant evidence that Petitioner's neuropathy predated her November 12, 2015 flu vaccination. Petitioner has fourteen (14) days from the filing of this Ruling to file a status report indicating how she wishes to proceed.

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master